

CLERK, U.S. BANKRUPTCY COURT
DISTRICT OF OREGON

MAR 28 2013

LODGED_____REC'D_____
PAID_____DOCKETED_____

# United States Bankruptcy Court
# for the District of Oregon

**Thomas M. Renn, Judge**
Virginia H. Denney, Judicial Assistant
Howard J. Newman, Law Clerk

405 East Eighth Avenue, Suite 2600
Eugene, Oregon 97401

(541) 431-4050
FAX: (541) 431-4047

March 27, 2013

Mr. Frank C. Rote, III
612 NW 5th Street
Grants Pass, OR 97526

Ms Kendall Ferguson
1867 Williams Highway, Suite 109
Grants Pass, OR 97527

RE:   ASLAKSON, Bryan D.; Case No. 12-62182-tmr13

Dear Counsel:

This mater came before the court for confirmation of Debtor's Chapter 13 plan dated May 17, 2012. Kurt and Suzie Pfohl objected. The trustee also objected but, after Debtor filed amended schedules, withdrew his objection. After several setovers, confirmation was heard in Medford on February 26, 2013. Before the hearing, the parties stipulated the only issues in contest were: 1) projected disposable income; 2) best interests; and 3) good faith.

After the February 26 hearing, I took the matter under advisement. After reviewing the testimony and exhibits, and after consideration of the arguments and submissions of the parties, I deny confirmation of Debtor's plan and make the following findings of fact and conclusions of law.

<u>Background Facts</u>:

Debtor resides in Grants Pass, Oregon, at a property he owns on Timberidge Road. He has three dependent children. He is presently the sole shareholder of a Subchapter S corporation named Northwest Property Services, Inc. (**NPSI**) which does business as Humboldt Termite and Pest Control. NPSI operates in Humboldt County, California. It presently has 11 employees; eight operate in the field and three in the office. NPSI owns assorted personal property used for pest control. Its main assets are 11 vehicles. Most have secured loans against them. Debtor is in title to six of the vehicles (the six vehicles). He testified that, although he is in title, NPSI owns the beneficial interests therein as it has paid for the vehicles and they are registered in NPSI's name. Debtor is also in title to a 2007 Mazda. However, he testified this is really his daughter's

car, as she exclusively uses it and has made the payments thereon to Rogue Federal Credit Union (RFCU).

While NPSI's offices are in Arcata, California, its shop is on the Timberidge property. NPSI pays Debtor $1,600/month to rent the shop and $2,600/month in salary. It also pays Debtor dividends. His Schedule I listed these at $2,063/month, which essentially matches Ex. D-2, which shows $2,065 in average net income for NPSI.

Debtor testified that he and his ex-wife loaned NPSI more than $50,000 but that as of the filing, he had forgiven that obligation and thus did not list it in the schedules.

Debtor's plan initially proposed monthly payments of $850 for 12 months, then $1,150 for 12 months, then $1,580 for 36 months. This plan appeared to require 60 payments, with a total $80,880 paid in. However, an ambiguity was created when ¶ 8 noted the plan was only "approximately" 60 months. Before hearing, Debtor advised his preference was to pay into the plan only until his attorney's fees and priority tax debt had been paid. This would have resulted in no distribution to general unsecured creditors. Post hearing, he offered a fixed 60 month plan.

**Best Interests Test**:

Section 1325(a)(4) requires that to confirm a plan "the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date." This test requires that unsecured creditors receive at least as much as they would in a hypothetical chapter 7 liquidation taking place at confirmation (i.e. the effective date of the plan). Debtor has the burden of proof. Amfac Distrib. Corp. v. Wolff (In re Wolff), 22 B.R. 510, 512 (9th Cir. BAP 1982), called into doubt on other grounds, Meyer v. Renteria (In re Renteria), 470 B.R. 838 (9th Cir. BAP 2012).

Per post-hearing correspondence by Debtor's counsel, the plan is now a fixed 60 month plan, paying in a total of $80,880. From that would be paid the trustee's commission of approximately 10% ($8,088), Debtor's unpaid attorney's fees ($16,930), and priority claims ($50,943), all of which total $75,961, leaving approximately $4,919 to be distributed to general unsecured creditors over the life of the plan. (A 1.2% dividend based on $396,000 in filed general unsecured claims.) The amount paid to unsecured creditors over five years, both priority and general (i.e. $50,943 + $4,919= $55,862) would then need to be discounted to a present value as of confirmation (i.e. the effective date of the plan). Id. at 513. Even giving debtor the benefit that payments would start immediately and would be level, the present value of a five year payout using prime (3.25%) as a discount factor (I had no evidence of a discount factor) would render a present value of $51,495.

Next we must look to see what would be distributed to unsecured creditors in a hypothetical chapter 7 liquidation. On the asset side, there is approximately $3,302 in equity in a 2008 Nissan Sentra. The next major asset is the NPSI stock. As to its value, we had conflicting evidence from Debtor. On direct, he testified in conclusory fashion, that he could not sell it because there are no buyers in the Humboldt County marketplace. He then testified that even if

NPSI's assets were liquidated and its debts paid, there would be nothing left to distribute to himself as sole shareholder. However, on cross, he admitted twice there would be such a distribution, but did not specify how much.

The documentary evidence indicates that on a balance sheet basis, as of the end of 2011, NPSI had equity of $175,258, and as of May 31, 2012, it had equity of $202,777. It was further explained, however, that $112,258 on the asset side was illusory, as it was merely an accounting entry (denoted as "other short term receivables") to deal with past dividends that exceeded actual profits. Deducting the $112,258, but adding back the $50,850 forgiven debt (which still shows as liability in the balance sheets), yields balance sheet equity of $113,850 as of December 31, 2011, and $141,369 as of May 31, 2012. Debtor argues these are simply book figures having nothing to do with reality. However, given Debtor's vague and at times contradictory testimony, I think they have at least some probative value. Also, NPSI's income statements show $88,806 in net income in 2011 (Ex. B, p.8) and $36,031 in net income for the first five months of 2012 (Ex. B, p.13). This shows the business has fairly significant positive cash flow which, contrary to Debtor's testimony, suggests the business has a market for sale.

At the bottom line, Debtor has the burden of proving his plan pays at least what unsecured creditors would receive in a hypothetical Chapter 7. This required proof that his hypothetical Chapter 7 estate would contain $62,470 or less ($51,495 plus estimated trustee's fees and liquidation costs). As noted, the Nissan had approximately $3,302 in equity. As to NPSI's value, I find Debtor did not prove it was less than the remaining $59,168 given: 1) his equivocal and conclusory testimony; 2) his lack of due diligence in even approaching a broker or liquidator to estimate the stock's value either with NPSI as a going concern or after its liquidation; 3) NPSI's significant balance sheet equity and positive cash flow; and 4) the value of a possible avoidable transfer - the forgiveness of the $50,580 by Debtor.

### **Projected Disposable Income**:

The Pfohls are unsecured creditors who have objected to confirmation. The plan does not pay 100%. In those circumstances, § 1325(b)(1)(B) requires Debtor to dedicate his projected disposable income (PDI) in the applicable commitment period (ACP).

The objecting party bears the initial burden to show form B22C is inaccurate. In re Reed, 454 B.R. 790, 796 (Bankr. D. Or. 2011), whereupon the burden shifts back to the debtor to ultimately show he meets the requirements of § 1325(b). Id.; see also Itule v. Heath (In re Heath), 182 B.R. 557, 560-61 (9th Cir. BAP 1995) (pre-BAPCPA); In re Ovalle, 2008 WL 926080, *1 (Bankr. E.D. Cal. April 4, 2008) (applying Heath post-BAPCPA). Here, the Pfohls have met their burden, whereas Debtor has failed his.

In calculating PDI, we must first compute "disposable income." We must also calculate the appropriate ACP. As thresholds, both require computation of Debtor's "current monthly income" (CMI). § 1325(b)(2), (b)(4)(A). If CMI is "below-median," his disposable income is calculated by deducting reasonable expenses (mostly found on Schedule J) from CMI,

§ 1325(b)(2)(A), and his ACP is three years (assuming PDI is positive).[1] § 1325(b)(4)(A)(I). If on the other hand, CMI is above-median, his disposable income would be calculated by deducting means test expenses from his CMI, § 1325(b)(3), and his ACP is five years (again assuming PDI is positive). § 1325(b)(4)(A)(ii)(II).

Debtor's B22C lists as average monthly income during the 6 full months pre-filing (November 2011-April, 2012), his $2,600 salary, the $1,600 shop rent, and $1,517 in corporate dividends, for a monthly average of $5,717. This computes to an annualized figure of $68,604, which was a mere $115 below the median income for a household of four ($68,719). When the $115 is halved to account for the 6-month CMI period, Debtor was $57.50 short of being above-median. Did Debtor receive at least an additional $57.50 in income during the 6 full months pre-filing? Yes, and as such he has not met his burden under § 1325(b).

CMI includes income from all sources, and specifically includes amounts paid regularly for household expenses, even if paid by a third party. The evidence reflects NPSI regularly pays Debtor's medical/dental expenses. In November 2011, NPSI paid at least $9,862 in dental expenses. Further, NPSI's income statement indicates it paid $2,117 in "employee medical" from January 1, 2012 through May 31, 2012. Ex. B, p.12. See also Amended SOFA #2 listing $1,719 in employer paid medical expenses between January 1, 2012 and May 18, 2012, the date of the petition. These expenses, at least through April 2012, should have been added in the CMI calculation and annualized.

In February 2012, NPSI paid $7,061.10 for Debtor to take a trip with his children to Disneyland. Debtor testified the Disneyland payments were in lieu of vacation pay. Although there was no evidence NPSI "regularly" paid for Debtor's vacations, § 101(10A) provides that CMI merely "includes" such regular payments by third parties. The term "includes" is not limiting. § 102(3). In fact, Debtor directly received these vacation benefits and in fact testified that they were in lieu of vacation pay. I hold that these types of benefits directly received by the sole shareholder (and his children) of a Subchapter S corporation, are to be included in CMI and annualized.

Debtor also appears to have been entitled to more net profits than the dividends actually paid him (which Debtor averaged at $1,517 per month) during the 6 full months pre-filing. Based on Debtor's business records his monthly net ordinary business income, excluding the direct benefits referenced above, averaged $2,831 for 2011 and $6,259 for the first five months of 2012, both exceeding Debtor's average. Some courts will impute this undistributed income to Debtor for CMI purposes. See In re Geiger, 2010 WL 2756760, *4 (Bankr. N. D. Ohio July 12, 2010).

It is clear that Debtor had more than $57.50 in income over the 6 full months pre-filing that was not declared on Form B22C. He is thus an "above-median" debtor. His ACP is 60 months (unless he has negative PDI). He has met that requirement by agreeing to make five years

---

[1] See In re Reed, 454 B.R. 790, 801-03 (Bankr. D. Or. 2011) (holding that Maney v. Kagenveama (In re Kagenveama), 541 F.3d 868, 872 (9th Cir. 2008) survived Hamilton v. Lanning, __ U.S. __, 130 S. Ct. 2464 (2010) on the issue of negative PDI, no ACP).

Mr. Rote and Ms Ferguson
March 27, 2013
Page 5

of payments. However, he has failed his burden of showing he has dedicated his PDI, because the predicate to figuring PDI, is figuring "disposable income." Here, Debtor's disposable income calculations are wholly inaccurate.

On the income side, Debtor's B22C understates his CMI and must include the medical, vacation, and any other direct benefits paid by NPSI to Debtor and his family. On the expense side, because he is above-median, Debtor must use the means test formulation, which means requiring him to file an amended B22C.

**Good Faith:**

Section 1325(a) requires that the plan be proposed in good faith. The 9th Circuit has adopted a "totality of the circumstances" test. See Meyer v. Lepe (In re Lepe), 470 B.R. 851, 857-58 (9th Cir. BAP 2012) (citations, quotations and footnotes omitted). Debtor, as the plan's proponent, has the burden of proving "good faith" by a preponderance. Id. at 863.

Here, indicia of lack of good faith include:

1) Original Schedule B omitted the Mazda;

2) Amended Schedule B listed the Mazda's value at $0 without explanation, and was filed only after objections to confirmation based on omissions were filed;

3) Original and Amended Schedules B listed NPSI's value at $0. I do not think this was a good faith estimate. Debtor did no due diligence and per the "best interests" discussion above, the NPSI stock in fact has substantial value;

4) Original and Amended Schedules B listed the six vehicles at $0 without explanation;

5) Original Schedule D did not list the two RFCU claims secured by the Mazda and Hummer respectively, and Amended D was filed only after objections based on omissions were filed;

6) Schedule G did not list the shop lease;

7) Line 15 of Exhibit D-2 did not differentiate between NPSI's "vehicle, machinery, and equipment" and "other business property" leases; neither did it attach a list of each type of lease as required by the form;

8) Form B22C significantly understated Debtor's CMI. That the omitted income puts Debtor above-median and into a fixed 60 month plan and the means test calculations, is probative of manipulation;

9) Original SOFA #2 did not disclose $6,650 in dividends and $1,719 in employer paid medical expenses for 2012, and the Amended SOFA was filed only after objections based on omissions were filed;

10) Original and Amended SOFA #10, which directs the Debtor to list any transfer not in the ordinary course of his business or financial affairs, made within the two years pre-dating the petition, did not list the $50,850 forgiven by Debtor.

11) NPSI's May 31, 2012 balance sheet, which was <u>post</u>-petition, and which was presumably reviewed by Debtor as sole officer and shareholder, listed the $50,850 loan as a liability, despite it having been forgiven;

12) Original SOFA #19 did not list the party holding Debtor's books and records, and the Amended SOFA was only filed after an objection based on omissions was filed;

13) It was only after a contested confirmation hearing and the accrual of substantial attorney's fees that would be paid ahead of general unsecured creditors, that Debtor offered to extend his plan to a fixed 60 months.

Based on the above, there is ample evidence to conclude Debtor has not met his burden of showing the plan was proposed in good faith.

**Conclusion**:

I, therefore, deny confirmation based on the above grounds. However, I will give Debtor 21 days to file an amended plan and amended B22C. A separate order consistent with this letter will be entered.

Very truly yours,

*[signature]*

THOMAS M. RENN
Bankruptcy Judge

TMR:vhd

cc: Mr. Paul Garrick, Trustee's Attorney